## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHARLES RANDLE, #M27372, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 16-cv-01191-NJR |
| | ) |
| KIMBERLY BUTLER, | ) |
| BRUCE RAUNER, | ) |
| JOHN BALDWIN, | ) |
| KENT BROOKMAN, | ) |
| JASON VASQUEZ, | ) |
| C/O BUMP, | ) |
| C/O WARD, | ) |
| JOHN DOE, | ) |
| MEZZO, | ) |
| DOCTOR TROST, | ) |
| GAIL WALLS, | ) |
| SYLVIA BUTLER, | ) |
| WEATHERFORD, | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| and PAPIS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Charles Randle, an inmate who is currently incarcerated at Menard Correctional Center ("Menard"), brings this civil rights action pursuant to 42 U.S.C. § 1983 against fifteen defendants who allegedly violated his constitutional rights at Menard in 2015-16. (Doc. 6). Plaintiff asserts claims against these officials under the First, Eighth, and Fourteenth Amendments, as well as Illinois state law. *Id*. He seeks monetary damages, injunctive relief,[1] and a prison transfer. (Doc. 6, p. 30).

---

[1] In his First Amended Complaint, Plaintiff specifically requests an Order requiring Menard officials to pass out cleaning supplies to inmates and to stop "double-bunking" inmates in cells designed for a single inmate; alternatively, he asks the Court to close the prison. (Doc. 6, p. 30).

This case is now before the Court for preliminary review of the First Amended Complaint (Doc. 6) pursuant to 28 U.S.C. § 1915A,[2] which provides:

> (a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
>
> (b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
>
> > (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
> >
> > (2) seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that any reasonable person would find meritless. *Lee v. Clinton,* 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id.* at 557. At this juncture, the factual allegations in the *pro se* complaint are to be liberally construed. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

---

[2] After filing an unsigned Complaint (Doc. 1) on October 28, 2016, Plaintiff filed a properly signed First Amended Complaint (Doc. 6) on November 14, 2016. Before this Court screened the amended complaint, Plaintiff filed a Motion for Preliminary Injunction and/or Temporary Restraining Order on December 2, 2016. (Doc. 7). In that document, Plaintiff indicated that he intended to expand the scope of his claims in the First Amended Complaint, and his request for emergency relief focused largely on events and claims that exceeded the scope of the First Amended Complaint. *Id.* On December 8, 2016, the Court entered an Order denying the request for injunctive relief but granting Plaintiff leave to file a Second Amended Complaint on or before January 8, 2017. (Doc. 9). Instead of filing a Second Amended Complaint, however, Plaintiff filed a Motion to Withdraw Request to File Second Amended Complaint (Doc. 10), which was granted on January 11, 2017. (Doc. 11). The First Amended Complaint is thus the subject of this screening order.

**First Amended Complaint**

Plaintiff asserts six sets of claims against the defendants in his First Amended Complaint. (Doc. 6). All events giving rise to these claims occurred at Menard in 2015 and 2016. (Docs. 6, 6-1). A summary of the factual allegations offered in support of the claims is followed by a brief analysis of each claim below. Any claim that is not recognized by the Court in this screening order should be considered dismissed without prejudice from this action.

### 1.       Conditions of Confinement

Plaintiff describes Menard as old, dilapidated, and overcrowded. (Doc. 6, pp. 4-8). The prison was allegedly built in 1878 and has not been updated. (Doc. 6, p. 4). Currently, more than 3,700 inmates are housed there. *Id*. Nonetheless, the facility and state budget cannot accommodate this inmate population. (Doc. 6, pp. 4-5).

Cells that were originally built to house one inmate are now used to house two inmates. (Doc. 6, p. 5). The cells are so small (4' by 10') that Plaintiff can touch opposite walls at the same time. (Doc. 6, p. 6). Inmates cannot move around their cells freely. (Doc. 6, pp. 6-7). One inmate must remain in bed while the other moves about the cell. *Id*. Even then, Plaintiff does not have enough room to stretch or exercise. *Id*. Although Menard has a policy authorizing inmates to exercise outside of their cells for one hour each day, prison officials often disregard the policy.

To accommodate two inmates, bunk beds have been installed in each cell. (Doc. 6, p. 6). The beds are only six feet in length. *Id*. Plaintiff is 6' 2" tall, and he does not fit in his bunk bed. *Id*. Further, the bunk beds have no ladder, so Plaintiff must step on the lower bunk or toilet and jump onto the top bunk. (Doc. 6, pp. 6-7). This places him at risk of injury. *Id*. The cramped quarters have caused Plaintiff to suffer from stiff joints, back pain, headaches, constipation, and depression. *Id*.

3

Plaintiff names three high-ranking officials, including Governor Bruce Rauner, Illinois Department of Corrections ("IDOC") Director John Baldwin, and Warden Kimberly Butler, in connection with this claim. (Doc. 6, pp. 4-5). Plaintiff does not allege that he ever complained directly to any of these individuals about the particular conditions of his confinement or his resulting medical issues. *Id*. He also does not allege that they received any written communications, grievances, or appeals from him on this topic. *Id*. Instead, Plaintiff alleges that they were generally aware of the conditions at Menard because of the numerous suits brought by inmates to complain about the conditions. *Id*. They chose to "turn a blind eye" to the conditions. *Id*.

## 2. Denial of Medical Care

Wexford Health Sources, Inc. is a private medical corporation that provides health care staff and services to prisons in Illinois. (Doc. 6, p. 8). Wexford is allegedly responsible for ensuring that state inmates receive adequate medical care for their serious medical needs. (Doc 6, pp. 8-9). Wexford routinely understaffs Menard's health care unit ("HCU"), however, and this decision has resulted in the denial of medical care for serious inmate medical needs. *Id*.

Plaintiff's medical claim arises from the denial of medical care for a large bunion that formed on his foot. (Doc. 6, pp. 8-10). He requested treatment for the painful egg-sized growth in several letters to Doctor Trost, but his written requests were ignored. (Doc. 6, p. 10). Plaintiff also spoke with several unidentified nurses,[3] as they made rounds to pass out medication, and they told him that Wexford prohibited them from addressing any medical needs that lacked a corresponding nurse sick call request. *Id*. He subsequently submitted five of these slips, along

---

[3] These individuals are not named as defendants in this action. Thus, any claims against them are considered dismissed without prejudice. *See* FED. R. CIV. P. 10(a) (noting that the title of the complaint "must name all the parties"); *Myles v. United States*, 416 F.3d 551, 551-52 (7th Cir. 2005) (holding that to be properly considered a party, a defendant must be "specif[ied] in the caption").

with additional written requests to Doctor Trost. (Doc. 6, p. 11). Unfortunately, however, no one responded to them. *Id*. When Plaintiff again asked the nurses for assistance, they refused his second request for treatment because Wexford only authorized them to treat inmates during nurse sick call. *Id*. The nurses and officers[4] ignored Plaintiff's subsequent direct pleas for help, even when they observed the bunion on his foot and heard his complaints of the pain. *Id*. Plaintiff sent grievances to Nurse Gail Walls, the HCU Administrator, but she also refused to see Plaintiff. (Doc. 6, p. 10).

At the same time, Plaintiff was denied a pair of new boots when he requested them from undisclosed prison officials.[5] (Doc. 6, pp. 7-8). This was initially because shoes were only approved for work, and ultimately because state funding for inmate shoes was cut entirely. *Id*. As a result, Plaintiff had no shoes that fit him comfortably. *Id*.

High-ranking state officials, including Governor Rauner, Director Baldwin, and Warden Butler, were generally aware of the problems caused by understaffing and overcrowding at Menard because of the numerous civil rights actions filed by inmates to complain about the denial of medical care. (Doc. 6, p. 9).  But these officials chose to turn a blind eye to the problem. (Doc. 6, pp. 9-10).

### 3.    Denial of Access to Courts

Plaintiff next claims that Warden Butler denied him access to the courts. (Doc. 6, p. 12). After filing a post-conviction petition, Plaintiff's attorney attempted to set up a phone call with him, on or about April 18, 2016, to discuss legal strategies. (Doc. 6, p. 12; Doc. 6-1, p. 2). An unidentified individual at Menard "denied her request for a legal call." (Doc. 6, p. 12). The

---

[4] Like the nurses, the "officers" are not named as defendants in this action, and any claims against them are also considered dismissed without prejudice. *Id*.
[5] These officials are also not identified as defendants, and any claims against them are considered dismissed without prejudice. *Id*.

individual told Plaintiff's attorney that Plaintiff "could not take legal calls at that point" in time. (Doc. 6, p. 12; Doc. 6-1, p. 2). Plaintiff blames Warden Butler for this single missed opportunity to speak with his attorney. (Doc. 6, p. 12). He asserts that "no set of circumstances . . . gives K. Butler or anyone on her staff permission to disregard Plaintiff's constitutional right to communicate with his attorney [and] have access to the courts." *Id*.

### 4.      Failure to Protect

Plaintiff also claims that Officer Bump, Officer Ward, and Warden Butler have failed to protect him from his former cellmate. (Doc. 6, pp. 13-14). Plaintiff allegedly sustained injuries from an attack by his cellmate in March or April 2016, after inadvertently grabbing his legal mail from between the cell bars. (*Id*.; Doc. 6-1, p. 12). After the attack, Plaintiff requested medical care for his injuries.[6] *Id*. While the two inmates were being cuffed and taken to the HCU, Plaintiff's cellmate threatened to "get him" or "have him 'fucked up'" by another inmate. (Doc. 6, p. 13).

Once in the HCU, Internal Affairs Officers Bump and Ward photographed Plaintiff's injuries and interviewed him. *Id*. They asked Plaintiff if he feared a future attack. *Id*. Plaintiff told the officers that he did, after relaying the threat he received from his cellmate. (Doc. 6, pp. 13-14). Plaintiff also expressed fear that his former cellmate would have one of his fellow gang members attack Plaintiff. *Id*.

Officers Bump and Ward explained that they were aware of the cellmate's gang affiliation, however, the officers were reluctant to transfer Plaintiff away from his cellmate.

---

[6] Although Plaintiff alleges that he received inadequate medical care for his injuries, he fails to describe the injuries or bring any claim based on the denial of treatment for them.

(Doc. 6, p. 14). They hoped to provoke another attack and establish grounds to move him[7] to administrative segregation or Pontiac Correctional Center. *Id.*

Despite these comments, the officers did separate the two inmates by placing them in "separate parts of the facility (different cell houses)." (Doc. 6, p. 14). Plaintiff's former cellmate still "got word to Plaintiff on several occasions that he hadn't forgot[ten] about him [and] . . . was gonna 'fuck him up.'" *Id.* Plaintiff wrote to Officer Bump, Officer Ward, and Warden Butler to complain about these threats, but they ignored Plaintiff's letters. *Id.*

### 5.   Due Process

Plaintiff also claims that he was denied due process of law in connection with a disciplinary ticket he received for theft and possession of contraband on October 27, 2015. (Doc. 6, pp. 15-19). On that date, Officer Kern conducted a shakedown while Plaintiff was employed as a kitchen worker. (Doc. 6, p. 15). While searching Plaintiff, the officer discovered two bottles tied to his waist that appeared to contain bleach and dishwasher soap. *Id.* The officer never opened the bottles, smelled them, or tested the contents. *Id.* Plaintiff received a ticket for what "appeared to be" bottles filled with bleach and dishwasher soap. *Id.*

On or around November 4, 2015, Plaintiff attended an Adjustment Committee hearing before Officers Vasquez and Brookman. (Doc. 6, pp. 15-16). Warden Butler never appointed a hearing investigator or officer to look into the matter prior to the hearing. (Doc. 6, p. 16). The warden also failed to train Officers Vasquez and Brookman to properly investigate such matters, and they simply assumed that the bottles contained bleach and dishwasher soap. *Id.* Plaintiff was found guilty of both rule violations based on the statement of Officer Kern. *Id.* Plaintiff received

---

[7] Plaintiff's use of this pronoun is ambiguous. It is unclear whether the two officers hoped to move Plaintiff or his cellmate to administrative segregation and Pontiac Correctional Center. (Doc. 6, p. 14).

one month of segregation, a one month demotion to C grade, and a one month commissary restriction. (Doc. 6, p. 16; Doc. 6-1, p. 4).

C/O Mezzo and C/O John Doe then placed Plaintiff in segregation with a cellmate who had recently been quarantined for chicken pox. (Doc. 6, pp. 18-19). The officers disregarded the rules for double-celling contagious and non-contagious inmates. (Doc. 6, p. 19). In addition, the cell was filthy, and Plaintiff was given no cleaning supplies. *Id*.

### 6.      Denial of Mental Health Care

Finally, Plaintiff alleges that he was denied adequate treatment for mental health issues at Menard. (Doc. 6, pp. 19-29). Plaintiff has been diagnosed with a "serious mental illness" that includes severe depression. (Doc. 6, pp. 20-21). He is required to see a mental health professional at least once a month and can request additional appointments if necessary. (Doc. 6, p. 21). He has repeatedly been denied mental health treatment for his depression at the prison, in violation of the Eighth Amendment and Illinois state law. *Id*.

On an undisclosed date, Plaintiff wrote a letter to Doctor Weatherford, explaining that he was depressed and needed to meet with the doctor to work through the "breakdown." *Id*. The doctor responded by writing a letter denying his request for treatment because Menard was on lockdown. *Id*. When he eventually met with Doctor Weatherford, Plaintiff explained that he was feeling severely depressed, helpless, and hopeless. *Id*. Doctor Weatherford refused to treat Plaintiff and instructed him to write to Doctor Butler instead. (Doc. 6, pp. 21-22).

Plaintiff wrote a long letter to Doctor Butler. (Doc. 6, p. 21). There, he described his feelings of severe depression, helplessness, and hopelessness. (Doc. 6, p. 22). Doctor Butler returned the letter with a response indicating that she had read his letter. *Id*. She did not, however, meet with him to discuss it. *Id*.

8

He wrote Doctor Butler a second letter, which the doctor interpreted as an "angry" communication. *Id*. In response, Doctor Butler met with Plaintiff in the HCU. *Id*. Plaintiff asked the doctor why she refused to see him after reviewing his first letter, and the doctor sarcastically responded, "I'm here now." (Doc. 6, pp. 23, 27). Plaintiff then told Doctor Butler that "she had failed him and let him down by not seeing him." *Id*.

Doctor Butler had Plaintiff placed in a "strip cell" for five days without clothing. *Id*. Plaintiff asserts that the purpose of the strip cell was to punish inmates who suffer from mental illness and cause them to suffer additional emotional distress. *Id*. During the five days he spent in the strip cell, Plaintiff was never re-evaluated. (Doc. 6, p. 24).

Nurse Papis then cleared him from "mental health close watch/observation status" and ordered his return to segregation. (Doc. 6, pp. 24-26). The nurse allegedly lacked the training or expertise necessary to make this decision, which Doctor Weatherford later confirmed. (Doc. 6, p. 25). Plaintiff wrote letters to complain about his continued denial of mental health treatment to Warden Butler, Doctor Trost, Doctor Butler, and Nurse Walls. *Id*. They ignored his letters. *Id*.

At some point, Plaintiff wrote another "angry" letter to Doctor Butler. (Doc. 6, p. 27). When Doctor Butler asked Plaintiff whether he believed and meant what he said in the letter, he assured her that he did. *Id*. Doctor Butler deemed him to be a suicide risk and decided that he required further observation. *Id*. He was again placed in the strip cell for seven days pursuant to Doctor Butler's orders. *Id*.

During this same time period, Plaintiff put in several requests to see Doctor Trost about chest pains. When he was finally seen, Doctor Trost ordered x-rays for a possible chest fracture. (Doc. 6, p. 28). Nurse Walls ultimately diagnosed him with stress-induced chest pains. *Id*. He asserts no independent claim for the denial of medical care in connection with this condition. *Id*.

Plaintiff asserts that Wexford, Director Baldwin, Warden Butler, Doctor Trost, and Doctor Butler have a policy, custom, or practice of denying all mental health call passes while the prison is on lockdown, regardless of the reason for the lockdown or whether the threat has been eliminated. (Doc. 6, pp. 19-29; Doc. 6-1). The denial of mental health treatment exacerbated Plaintiff's symptoms of depression and resulted in his eventual placement in a strip cell on two separate occasions. The same defendants have a policy, custom, or practice of using the strip cell as a means of punishment rather than treatment, as evidenced by the failure to re-evaluate Plaintiff after he was placed in the strip cell. (Doc. 6, p. 23). Plaintiff names the defendants in connection with an Eighth Amendment claim based on the denial of mental health treatment and a state law claim for the intentional infliction of emotional distress. *Id*.

## Discussion

To facilitate the orderly management of future proceedings in this case, and in accordance with the objectives of Federal Rules of Civil Procedure 8(e) and 10(b), the Court has organized the claims in Plaintiff's *pro se* First Amended Complaint into the following enumerated counts:

**Count 1** - Eighth Amendment claim against Governor Rauner, Director Baldwin, and Warden Butler for subjecting Plaintiff to unconstitutional conditions of confinement at Menard by placing two inmates in a cell designed for only one, with double bunks and limited exercise opportunities outside of the cell.

**Count 2** - Eighth Amendment claim against Wexford, Governor Rauner, Director Baldwin, Warden Butler, Doctor Trost, and Nurse Walls for exhibiting deliberate indifference to Plaintiff's bunion.

**Count 3** - First and/or Fourteenth Amendment claim against Warden Butler for allowing prison officials to interfere with Plaintiff's phone calls from his attorney in a post-conviction proceeding.

**Count 4** - Eighth Amendment claim against Warden Butler, C/O Bump, and C/O Ward for failing to protect Plaintiff from his cellmate, after

Plaintiff was attacked and injured by him in 2016.

**Count 5 -** Fourteenth Amendment claim against C/O Mezzo, C/O John Doe, C/O Vasquez, C/O Brookman, and Warden Butler for depriving Plaintiff of a protected liberty interest without due process of law by punishing him with segregation for possession of contraband and theft arising from Plaintiff's possession of two spray bottles containing unidentified liquid.

**Count 6 -** Eighth Amendment deliberate indifference and/or intentional infliction of emotional distress claim arising from the denial of adequate mental health treatment by Wexford, Doctor Weatherford, Doctor Butler, Doctor Trost, Nurse Walls, Warden Butler, Director Baldwin, and Nurse Papis.

The parties and the Court will continue using these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these claims does not constitute an opinion regarding their merits.

### Claims Subject to Further Review

### Count 1

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (citing *Robinson v. California*, 370 U.S. 600 (1962)). Although the Constitution "does not mandate comfortable prisons," it does require inmates to be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). A claim for unconstitutional conditions of confinement includes an objective and a subjective component. *Farmer*, 511 U.S. at 834. Plaintiff must demonstrate (1) that he suffered a sufficiently serious deprivation (*i.e.*, objective standard) and (2) the defendant acted with deliberate indifference to his conditions of confinement (*i.e.*,

subjective standard). *Sain v. Wood*, 512 F.3d 886, 893-94 (7th Cir. 2008) (citing *Farmer*, 511 U.S. at 837).

The allegations satisfy the objective component of this claim for screening purposes. Plaintiff describes being housed with a cellmate in a cell designed for a single person. (Doc. 6, pp. 4-8). Movement in the cell is restricted because of its small size. *Id.* While one inmate uses the floor, the other must remain on his bunk. *Id.* Even the beds are too short for Plaintiff. *Id.* Exercise opportunities outside of the cell are also limited. *Id.* As a result of these conditions, Plaintiff has allegedly suffered from physical and mental health issues. *Id.*

The question is whether the high-ranking officials named in connection with this claim exhibited deliberate indifference to these conditions. After all, Plaintiff does not allege that he submitted a grievance, appeal, or letter directly to any of them. He did not speak with any of them about the conditions of his confinement. Along with the First Amended Complaint, he included a single grievance addressing the conditions of his confinement, but it was denied by a lower level prison official who noted that "cell size and occupancy standards are a matter of Admin decision." (Doc. 6-1, p. 14). He also alleges that Warden Butler, Director Baldwin, and Governor Rauner must have known about the conditions because of the numerous grievances and lawsuits that have been filed over the years to challenge the same conditions (*i.e.*, Menard's small cells, frequent lockdowns, and lack of exercise opportunities).

The Seventh Circuit has found that prison administrators in a similar situation were "well aware of multiple grievances from inmates regarding small cells" based on "numerous past lawsuits, including one specifically describing and ordering a remedial plan for overcrowding, small cells, and lack of adequate medical care. . . ." *Turley v. Rednour*, 729 F.3d 645, 652-53 (7th Cir. 2013) (citing *Lightfoot v. Walker*, 486 F. Supp. 504, 511 (C.D. Ill. 1980); *Munson v.*

*Hulick*, 2010 WL 2698279 (S.D. Ill. July 7, 2010) (grievances filed by plaintiff and other inmates were deemed sufficient at screening to put prison officials on notice of unconstitutional conditions where Menard prisoner challenged 40' cells that held 2 inmates for 21-22 hours per day)). In addition to these past grievances and suits referred to by Plaintiff in his First Amended Complaint, Plaintiff did complain about the conditions in at least one grievance. (Doc. 6-1, p. 14). It was denied because decisions regarding cell size and occupancy are "Admin decision[s]." (Doc. 6-1, p. 14). Given these considerations, the Court finds that the First Amended Complaint satisfies the subjective component of this claim against Warden Butler and Director Baldwin, two high-ranking administrative officials who were allegedly involved in the decision regarding inmate housing, lockdowns, and exercise opportunities at Menard.

Count 1 shall receive further review against Warden Butler and Director Baldwin. However, this claim shall be dismissed without prejudice against Governor Rauner, whose involvement in prison housing decisions is not established by the allegations and who would have no involvement in carrying out any injunctive relief that is ultimately ordered.

### Count 2

It is well established that prison officials and medical personnel violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *Rasho v. Elyea*, -- F.3d --, 2017 WL 892500 (7th Cir. March 7, 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016)). To state a claim in this context, a plaintiff must demonstrate that he suffered from a serious medical condition (*i.e.*, objective standard) and the prison official responded with deliberate indifference (*i.e.*, subjective standard). *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (citing *Farmer*, 511 U.S. at 834; *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)).

The Court finds that Plaintiff's medical condition is sufficiently serious to support an Eighth Amendment claim at screening. He describes the bunion as being the size of a large egg. *See Jones v. Drew*, 221 F. App'x 450 (7th Cir. 2007) (parties did not dispute that inmate's painful bunions constituted serious medical need); *Clark v. Sweeney*, No. 15-cv-333-bbc, 2016 WL 6495625 (W.D. Wis. 2016) (same). In addition, Plaintiff alleges that the bunion causes him to suffer pain and prevents him from wearing shoes comfortably. *Id.*

The allegations also support a claim of deliberate indifference against Doctor Trost and Nurse Walls, based on their failure to treat Plaintiff. (Doc. 6, pp. 10-11). Doctor Trost allegedly ignored Plaintiff's written complaints and requests for treatment. (Doc. 6, p. 11). Nurse Walls refused to meet with Plaintiff to discuss treatment. (Doc. 6, p. 10). Count 2 is subject to further review against both of these defendants.

Plaintiff blames this denial of medical care on Wexford. The Seventh Circuit has held that the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014) (noting every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). In order to prevail on this claim against Wexford, Plaintiff must establish that its policies, customs, or practices caused a constitutional violation. *Whiting*, 839 F.3d at 664 (citing *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009)). Plaintiff alleges that Wexford instituted several policies, customs, or practices that resulted in the denial of care for his bunion, including its decision to understaff Menard's HCU and its decision to implement procedures for nurse sick call that ultimately

prevented Plaintiff from obtaining any meaningful treatment. Count 2 shall receive further review against Wexford.

The Court will allow Plaintiff to proceed with Count 2 against Warden Butler and Director Baldwin for the same reasons the Court allowed Count 1 to proceed against these defendants. Likewise, Count 2 shall be dismissed without prejudice against Governor Rauner for the same reasons the Court dismissed Count 1 against this defendant.

In summary, Count 2 shall receive further review against Wexford, Doctor Trost, Nurse Walls, Warden Butler, and Director Baldwin. However, this claim shall be dismissed without prejudice against Governor Rauner.

### Count 4

To state an Eighth Amendment failure-to-protect claim, Plaintiff must allege that (1) he was incarcerated under conditions posing a substantial risk of serious harm (*i.e.*, objective standard), and (2) the defendants acted with deliberate indifference to that risk (*i.e.*, subjective standard). *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (citing *Farmer*, 511 U.S. at 834). The objective component of this claim requires something more than a generalized risk of violence. *Brown*, 398 F.3d at 909; *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). Plaintiff must allege a "tangible threat to his safety or well-being." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Plaintiff's receipt of multiple threats from his former cellmate after being attacked by him in March 2016 satisfies the objective component of this claim for screening purposes.

The subjective component of this claim is satisfied where a prison official knows that an attack is "almost certain to materialize if nothing is done." *Brown*, 398 F.3d at 911. After actually being attacked by his cellmate, Plaintiff continued receiving threats of physical harm

from his former cellmate. (Doc. 6, pp. 13-14). Plaintiff informed the three defendants of these continued threats in writing, but they took no action. *Id*. At this stage, the Court finds that the allegations satisfy the subjective standard for this claim as well.

Accordingly, Count 4 shall receive further review against Officer Bump, Officer Ward, and Warden Butler.

## Count 6

Claims may arise under the Eighth Amendment for deliberate indifference to medical conditions that include mental illness. *Rasho v. Elyea*, -- F.3d --, 2017 WL 892500 (7th Cir. March 7, 2017). Plaintiff must satisfy the objective and subjective standards applicable to all Eighth Amendment claims before proceeding with such a claim. He has done so in the First Amended Complaint.

Plaintiff's allegations of mental illness satisfy the objective component of this claim at screening. He does not reveal his exact diagnosis. (Doc. 6, pp. 19-29). He alleges, however, that the diagnosis includes severe depression. (Doc. 6, pp. 20-21). Plaintiff also alleges that his mental illness was diagnosed by a mental health professional, and it requires monthly follow-up with a professional. *Id*. During the relevant time period, he describes a "breakdown" that necessitated immediate treatment. (Doc. 6, p. 21).

The allegations also suggest that the defendants may have responded to Plaintiff's mental health needs with deliberate indifference. Wexford, Director Baldwin, Warden Butler, Doctor Trost, and Doctor Butler had a policy, custom, or practice of refusing mental health treatment while inmates were on lockdown, an allegedly frequent occurrence at Menard. (Doc. 6, pp. 19-29; Doc. 6-1). Doctor Weatherford refused Plaintiff's request for immediate mental health treatment during one of these lockdowns and then instructed him to write to Doctor Butler

instead. (Doc. 6, pp. 21-22). Doctor Butler ignored Plaintiff's first written request for treatment and placed him in a strip cell in response to his second and third letters without re-evaluating him at any time during his placement in the strip cell. (Doc. 6, pp. 21-24, 27). Nurse Papis then released Plaintiff from the strip cell, despite being unqualified to do so. (Doc. 6, pp. 24-26). Warden Butler, Doctor Trost, Doctor Butler, and Nurse Walls ignored Plaintiff's complaints regarding inadequate mental health treatment. (Doc. 6, p. 25).

The Eighth Amendment claim in Count 6 shall receive further review against Wexford, Doctor Weatherford, Doctor Butler, Doctor Trost, Nurse Walls, Warden Butler, Director Baldwin, and Nurse Papis.

The Court will dismiss the Illinois state law claim against the same defendants for intentional infliction of emotional distress. Where a district court has original jurisdiction over a civil action such as a § 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), so long as the state claims "derive from a common nucleus of operative fact" with the original federal claims. *Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921, 936 (7th Cir. 2008). "A loose factual connection is generally sufficient." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008) (citing *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299 (7th Cir. 1995)). The Court has original jurisdiction over this action. Because the federal and state claims arise from the same facts, the district court also has supplemental jurisdiction over the related state law claim.

A plaintiff claiming intentional infliction of emotional distress must demonstrate that a defendant intentionally or recklessly engaged in "extreme and outrageous conduct" that resulted in severe emotional distress. *Somberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006); *see Lopez v. City of Chi.*, 464 F.3d 711, 720 (7th Cir. 2006). The tort has three

components: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To be actionable, the defendant's conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992); *Campbell v. A.C. Equip. Servs. Corp.*, *Inc.*, 610 N.E.2d 745, 749 (Ill. App. 1993)).

The allegations do not satisfy these requirements for screening purposes. Plaintiff does not allege that any particular defendant engaged in conduct that was truly extreme and outrageous with the intention of inflicting severe emotional distress, or even knowing that it would almost certainly follow. Plaintiff does not indicate that he actually suffered from severe emotional distress that was attributable to the conduct of the defendants. This state law claim shall therefore be dismissed. However, the dismissal shall be without prejudice to Plaintiff re-pleading the claim in this or any other suit in state of federal court.

In summary, the Eighth Amendment deliberate indifference claim in Count 6 shall receive further review against Wexford, Doctor Weatherford, Doctor Butler, Doctor Trost, Nurse Walls, Warden Butler, Director Baldwin, and Nurse Papis. The Illinois state law claim for intentional infliction of emotional distress shall be dismissed without prejudice against these same defendants.

18

## Claims Subject to Dismissal

### Count 3

The Seventh Circuit uses a two-part test when determining whether the conduct of a prison official violates an inmate's right of access to the courts. *Lehn v. Holmes*, 364 F.3d 862, 868 (7th Cir. 2004). First, the inmate must show that prison officials failed "to assist in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Jenkins v. Lane,* 977 F.2d 266, 268 (7th Cir. 1992) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). Second, the inmate must be able to show "some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation." *Alston v. DeBruyn*, 13 F.3d 1036, 1041 (7th Cir. 1994); *see also Lehn*, 364 F. 3d at 868. A plaintiff must explain "the connection between the alleged denial of access . . . and an inability to pursue a legitimate challenge to a conviction, sentence, or prison conditions." *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009) (internal quotation and citation omitted); *accord Guajardo Palma v. Martinson*, 622 F.3d 801, 805-06 (7th Cir. 2010). This requires Plaintiff to identify the underlying claim that was lost. *See Christopher v. Harbury*, 536 U.S. 403, 416 (2002); *Steidl v. Fermon*, 494 F.3d 623, 633 (7th Cir. 2007).

Here, Plaintiff alleges that he was denied the opportunity to speak with his attorney on a single occasion on in April 2016. (Doc. 6, p. 12; Doc. 6-1, p. 2). It is difficult to imagine how the denial of a single phone call would foreclose his entire claim for post-conviction relief. Plaintiff does not make this claim, and his exhibits reveal that the missed phone call made no measurable difference in his post-conviction proceedings. (Doc. 6-2, p. 2). There, Plaintiff's attorney states in a letter dated April 18, 2016:

> Your case was in court on April 15, 2016 in front of Honorable Judge Ginez. At
> that time your case was continued until June 17, 2016. Your case is set for status.
> I am currently awaiting the transcript for your arraignment on May 28, 2009 as
> that day was not included in the transcripts I received from the Appellate Court.
>
> I received your letter dated April 1, 2016. I attempted to set up an attorney/client
> phone call for today but I was told that you could not take phone calls at this
> point. I will try to set up a phone call for April 29, 2016, in hopes that you will be
> able to take calls at that point. . . .

*Id*. According to the letter, the single missed phone call with Plaintiff's attorney was

rescheduled. Plaintiff does not allege that any other phone calls were denied, or that the denial

resulted from the conduct of Warden Butler. Moreover, the missed phone call did not foreclose

any claims. The post-conviction matter was simply set for another status conference while

Plaintiff's attorney awaited the receipt of transcripts from the Appellate Court. By all indications,

the decision to schedule a status conference in June had nothing to do with the missed phone call

in April. Plaintiff has stated no claim for relief based on a denial of access to the courts. *See*

*Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) ("To the extent that

an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the

exhibit takes precedence."). Accordingly, Count 3 shall be dismissed with prejudice for failure to

state a claim upon which relief may be granted.

### Count 5

Plaintiff claims that he was denied due process protections in connection with the

disciplinary ticket he received for theft and possession of contraband, after Officer Kern

discovered two bottles of liquid strapped to his waist during a shakedown in November 2015.

(Doc. 6, pp. 15-19). The only due process concern raised by Plaintiff in connection with the

ticket is the Adjustment Committee's reliance on Officer Kern's statement regarding the contents

of the bottles. *Id*. Officer Kern allegedly wrote that the bottles "appeared" to contain dish soap

and bleach. *Id*. Plaintiff maintains that this statement amounted to pure speculation. *Id*. Nevertheless, the Adjustment Committee accepted it as true and found Plaintiff guilty of both rule violations without ever investigating the matter. *Id*.

Prison disciplinary hearings satisfy due process requirements where an inmate receives: (1) advance written notice of the charges against the plaintiff; (2) the opportunity to appear before an impartial hearing body to contest the charges; (3) the opportunity to call witnesses and present documentary evidence in his defense (if prison safety allows and subject to the discretion of correctional officers); and (4) a written statement summarizing the reasons for the discipline imposed. *See Wolff v. McDonnell*, 418 U.S. 539, 563-69 (1974). In addition, the decision of the Adjustment Committee must be supported by "some evidence." *Black v. Lane*, 22 F.3d 1395 (7th Cir. 1994). Plaintiff essentially argues that the Adjustment Committee's decision rested on no evidence of his guilt.

Among other things, Plaintiff overlooks the fact that no due process protections are triggered in the first place, unless he had a protected liberty interest in avoiding segregation. A protected liberty interest arises when confinement in segregation "impose[s] an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When making this determination, courts consider two factors: "the combined import of the duration of the segregative [sic] confinement *and* the conditions endured." *Id*. at 743 (citing *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009)) (emphasis in original). If the length of confinement in segregation is substantial and the conditions of confinement were unusually harsh, a liberty interest may arise. *Marion*, 559 F.3d at 697-98, n. 2.

When the duration of segregative confinement is sufficiently short, as here, courts are not required to consider the conditions unless they were particularly harsh. Plaintiff was punished with a single month of segregation. He describes conditions that include a dirty cell, a lack of cleaning supplies, and an inmate who was in his third week of quarantine for chicken pox. Noticeably absent from the allegations was any claim by Plaintiff that his cellmate ever developed chicken pox or, more importantly, that Plaintiff was at risk of contracting chicken pox or exposing others to the virus if he was exposed to it.

At this stage, the Court finds that neither the duration of segregative confinement nor the conditions described by Plaintiff give rise to a protected liberty interest under the Fourteenth Amendment. No due process protections were triggered in the first place, and Plaintiff's allegations that he was denied one or more of these protections at his disciplinary hearing support no claim against the defendants. The Fourteenth Amendment due process claim in Count 5 is therefore dismissed without prejudice against Officer Vasquez, Officer Brookman, Warden Butler, C/O Mezzo, and C/O Doe. The related Eighth Amendment conditions of confinement claim is also considered dismissed without prejudice against these defendants.

**Pending Motions**

1.   **Motion to Appoint Counsel (Doc. 3)**

Plaintiff's Motion to Appoint Counsel shall be **REFERRED** to a United States Magistrate Judge for a decision.

2.   **Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 12)**

In his Motion for Temporary Restraining Order ("TRO"), Plaintiff alleges that he was transferred to Menard's East Cell House on January 27, 2017. (Doc. 12, p. 3). This is where the altercation between Plaintiff and his former cellmate occurred in March or April 2016. *Id.*

Plaintiff does not indicate who made the decision to transfer him there or whether his cellmate was still housed there at the time. *Id*. He insists, however, that the decision was made in order to retaliate against him. *Id*.

On the same day he transferred to the East Cell House, Plaintiff's fellow inmates reminded him of the altercation that occurred almost a year earlier. Plaintiff notified three prison officials (Wilburn, Smitty, and Rogers) about this on February 18-19, 2017. (Doc. 12, p. 3). None of these individuals are named as defendants in this action. *Id*. He has heard nothing from them to date. *Id*.

Plaintiff then spoke with C/O Phelps, who is also not a defendant in this action, on March 1, 2017. (Doc. 12, p. 3). The officer gave him the option of entering protective custody. *Id*. Plaintiff refused the offer. *Id*. He does not consider it "legitimate" due to its location in Menard's North 1 Cell House relative to the general inmate population. *Id*. He also objects to the size of the small cells. *Id*. In addition, the inmate workers have a tendency to tamper with the inmate food and property in protective custody. *Id*. According to Plaintiff, "Pontiac Correctional Center is the only legitimate Maximum Security Facility that house[s] inmates safely & adequately away from general population." *Id*.

On March 3, 2017, Plaintiff was transferred from Menard's East Cell House to the North 1 Cell House. (Doc. 12, p. 7). He objects to this decision. *Id*. The cell has mold, and chipping paint falls from the ceiling into his mouth and eyes as he sleeps. *Id*. His bunk bed is also too small. When he complained to unidentified prison officials about the conditions, they blamed the state budget. *Id*. Plaintiff claims that his symptoms of depression, anxiety, and chest pains have returned. *Id*.

Plaintiff has contacted Doctor Trost, Nurse Walls, Ms. William, and Doctor Butler to complain about increased emotional distress, including anxiety, mental confusion, and difficulty concentrating. (Doc. 12, pp. 6-7). He has asked for permission to leave his cell more often and has even been approved for a job. *Id*. The defendants have taken no steps to assist him, however, and his job approval expired. *Id*. He believes that he has been treated poorly because of his race. *Id*. He now requests a transfer to another facility. (Doc. 12, p. 8).

The motion offers insufficient grounds for a TRO, which is an order issued without notice to the party to be enjoined that may last no more than fourteen days. *See* FED. R. CIV. P. 65(b)(2). It may issue only if "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1)(A). This form of relief is warranted "to prevent a substantial risk of injury from ripening into actual harm." *Farmer*, 511 U.S. at 845.

In contrast, a preliminary injunction is issued only after the adverse party is given notice and an opportunity to oppose the motion. *See* FED. R. CIV. P. 65(a)(1). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

Plaintiff has not indicated what irreparable harm will result from the denial of a TRO. He complains about many things, but primarily about his placement near the cellmate who attacked him last year and then threatened future harm. However, Plaintiff does not allege that the

24

cellmate was still housed in the East Cell House when he returned there on January 27, 2017. He complains of no threats from his former cellmate or his affiliates after transferring there. Further, he was offered the option of entering protective custody and refused. Even then, he was transferred out of the East Cell House. He names no defendants in connection with these recent transfer decisions, and he names no other prison officials who have violated his constitutional rights in connection with the transfer decision.

Plaintiff finds his current cell unacceptable because it has mold and chipping paint. Besides these two conditions, he offers no other indication that his cell is causing him to suffer irreparable harm or a substantial risk of it at this time. "[P]risoners possess neither liberty nor property in their classifications and prison assignments. States may move their charges to any prison in the system." *DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) (citing *Montanye v. Haymes*, 427 U.S. 236 (1976)). *See also Meachum v. Fano*, 427 U.S. 215, 224 (1976) (the Constitution does not guarantee placement in a particular prison). His current placement does not warrant the drastic relief he now seeks, given the allegations he has put forth.

And although he briefly mentions the need for mental health treatment due to increased feelings of depression, Plaintiff does not describe his symptoms in sufficient detail to support the issuance of a TRO transferring him to another prison. He alludes to some symptoms, such as anxiety and lack of focus, but fails to describe their intensity, frequency, or duration. Plaintiff's remaining claims of retaliation, emotional distress, etc. are unsupported by any facts in his Motion and/or are asserted against no one in particular (or no defendants). Under the circumstances, the Court declines to issue a TRO. Accordingly, Plaintiff's Motion for a Temporary Restraining Order is **DENIED** (Doc. 12) without prejudice.

### Disposition

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order is **DENIED** without prejudice. The Clerk is **DIRECTED** to **TERMINATE** the Motion (Doc. 12) and separately docket a Motion for Preliminary Injunction, which shall be **REFERRED** to a United States Magistrate Judge for consideration of Plaintiff's request for a prison transfer.

**IT IS ORDERED** that **COUNT 1** shall receive further review against Defendants **KIMBERLY BUTLER** and **JOHN BALDWIN**. This claim is **DISMISSED** without prejudice against **BRUCE RAUNER** for failure to state a claim upon which relief may be granted.

**IT IS ORDERED** that **COUNT 2** shall receive further review against Defendants **JOHN BALDWIN, KIMBERLY BUTLER, DOCTOR TROST, GAIL WALLS,** and **WEXFORD HEALTH SOURCES, INC.** This claim is **DISMISSED** without prejudice against **BRUCE RAUNER** for failure to state a claim upon which relief may be granted.

**IT IS ORDERED** that **COUNT 3** is **DISMISSED** with prejudice against Defendant **KIMBERLY BUTLER** for failure to state a claim upon which relief may be granted.

**IT IS ORDERED** that **COUNT 4** shall receive further review against Defendants **KIMBERLY BUTLER, C/O BUMP,** and **C/O WARD.**

**IT IS ORDERED** that **COUNT 5** is **DISMISSED** without prejudice against Defendants **KIMBERLY BUTLER, KENT BROOKMAN, JASON VASQUEZ, C/O MEZZO, JOHN DOE** for failure to state a claim upon which relief may be granted.

**IT IS ALSO ORDERED** that **COUNT 6** shall receive further review against Defendants **JOHN BALDWIN, KIMBERLY BUTLER, WEATHERFORD, SYLVIA BUTLER, DOCTOR TROST, GAIL WALLS, NURSE PAPIS,** and **WEXFORD HEALTH SOURCES, INC.**

**IT IS ORDERED** that, unless otherwise stated, the above-referenced claims are considered **DISMISSED** with prejudice against those defendants who are not named in the Disposition in connection with said claims.

**IT IS ALSO ORDERED** that any claims set forth in the First Amended Complaint but not recognized herein are considered **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted.

With respect to **COUNTS 1, 2, 4,** and **6**, the Clerk of Court shall prepare for Defendants **JOHN BALDWIN, KIMBERLY BUTLER, C/O BUMP, C/O WARD, DOCTOR TROST, GAIL WALLS, WEATHERFORD, SYLVIA BUTLER, NURSE PAPIS,** and **WEXFORD HEALTH SOURCES, INC.**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the First Amended Complaint (Doc. 6), and this Memorandum and Order to each defendant's place of employment as identified by Plaintiff. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a defendant who cannot be found at the address provided by Plaintiff, the employer shall furnish the Clerk with that defendant's current work address, or, if not known, the defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file, nor disclosed by the Clerk.

Plaintiff shall serve upon each defendant (or upon defense counsel once an appearance is entered), a copy of every further pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of any document was served on each defendant or counsel. Any paper received by a district judge or magistrate judge that has not been filed with the Clerk or that fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the First Amended Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge **Donald G. Wilkerson** for further pre-trial proceedings, including a decision on the Motion to Appoint Counsel (Doc. 3) and for handling of the Motion for Preliminary Injunction.

Further, this entire matter is hereby **REFERRED** to United States Magistrate Judge **Wilkerson** for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, regardless of the fact that his application to proceed *in forma pauperis* was granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, the applicant and his or her attorney were deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against Plaintiff and remit the balance to Plaintiff. Local Rule 3.1(c)(1).

Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than seven **days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:  March 17, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**