**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**CHARLES RANDLE,**

**Plaintiff,**

**v.**

**JOHN BALDWIN, SYLVIA BUTLER (AKA SYLVIA LANE), CORY BUMP, KIMBERLY BUTLER, GAIL WALLS, and NATHANIEL WARD,**

**Defendants.**

**Case No. 3:16-CV-1191-NJR**

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 172) filed by Defendants John Baldwin ("Baldwin"), Sylvia Butler (AKA Sylvia Lane) ("Lane"), Kimberly Butler ("Butler"), Cory Bump ("Bump"), Gail Walls ("Walls"), and Nathaniel Ward ("Ward"). For the reasons set forth below, the Court grant in part and denies in part the Motion for Summary Judgment.

This action is based on the alleged conditions of Plaintiff Charles Randle's incarceration at Menard Correctional Center ("Menard"), a prison operated by the Illinois Department of Corrections ("IDOC"). Randle filed his complaint on October 28, 2016 (Doc. 1). After the complaint was screened by this Court pursuant to 28 U.S.C. § 1915A, Randle was allowed to proceed on four counts (Doc. 13). This Court subsequently granted summary judgment to certain defendants (Doc. 124), leaving Randle proceeding as follows:

**Count One:** Eighth Amendment claim against Butler and Baldwin for subjecting Randle to unconstitutional conditions of confinement at Menard by placing two inmates in a cell designed for only one, with double bunks and limited exercise opportunities outside of the cell.

**Count Two:** Eighth Amendment claim against Baldwin, Butler and Walls for exhibiting deliberate indifference to Randle's bunion.

**Count Three:** (formerly Count 4) Eighth Amendment claim against Butler, Bump, and Ward for failing to protect Randle from his cellmate, after Randle was attacked and injured by him in 2016.

**Count Four:** (formerly Count 6) Eighth Amendment deliberate indifference claim against Baldwin, Butler, Lane, and Walls arising from the denial of adequate mental health treatment.

All remaining defendants filed a Motion for Summary Judgment (Doc. 172) on all counts on August 16, 2019.

## FACTUAL BACKGROUND

*Count One:*

Randle was incarcerated at Menard for the periods relevant to this action, from May 2012 until approximately August 2017, after which he was transferred to Stateville Correctional Center, a different IDOC facility (Doc. 173-1 at 6). During his time at Menard, Randle stayed in cells in various parts of the prison for certain periods. In his own deposition, Randle stated that he recalled staying in the following zones within Menard: West House, East House, North 1, North Uppers, South Uppers, North 2, and Segregation (*Id.* at 2). Randle stated that his complaints about cell size had related specifically to the time that he spent in North 1 from October 2012 through approximately 2015 and again

in 2016, and shorter periods spent in segregation in North 2 in 2012 and 2015 (*Id.* at 8). Randle stated that during these periods, space in his cells was restricted to the point that it was difficult for him to do anything but lie down, leading to anxiety and depression (*Id.*). During these periods, Randle states that he often had a cellmate (*Id.* at 9). During normal conditions, Randle had yard access when the weather permitted, but Randle states that he was on lockdown for lengthy periods and often had no yard access (*Id.*). Randle was also able to leave his cell to go to the mess hall and occasionally to the commissary or the library (*Id.* at 10).

Randle indicates that he attempted to communicate with prison officials about his issues with the size of his cell (*Id.* at 11). Specifically, Randle attempted to contact Butler, the warden of Menard at the time, through the grievance process, and he attempted to communicate with Baldwin, the director of IDOC, through letters to the Administrative Review Board (*Id.* at 12). Randle stated that he did not know for a fact whether either Butler or Baldwin had received his communications but that he never received a response from either of them (*Id.*). Butler has stated in an affidavit that she was never aware of Randle's complaints regarding his cell and that assistant wardens at Menard were in charge of day-to-day operations at the facility during the period in question (Doc. 173-2). Randle's medical records indicate that on at least one occasion he complained of his cell size to a nurse (Doc. 173-5 at 76).

*Count Two:*

Randle stated in his deposition that he first noticed that he had developed a bunion in 2012, at which point he went to sick call for treatment (Doc. 173-1 at 12). Randle

subsequently went back to sick call multiple times seeking treatment, he states (*Id.*). Randle's letter to the Administrative Review Board included complaints about his bunion, and he believed that it would go to Baldwin (*Id.*). Randle's grievance addressed to Butler additionally included complaints related to his bunion (*Id.*). Randle never spoke with Baldwin or Butler directly regarding his bunion and had no confirmation that they ever received his communications (*Id.*). Randle also filed a grievance with Walls, then the administrator of the health care unit at Menard, who responded to his grievance indicating that she saw nothing in his medical records about a bunion and that he should go to sick call (*Id.* at 15–16). Randle did seek treatment at sick call, but he was given only Ibuprofen for his bunion while at Menard (*Id.* at 17). This is confirmed by Randle's medical records, which indicates that he sought treatment for his bunion on July 12, 2016, and was prescribed Ibuprofen (Doc. 173-5 at 67). Records indicate that on that date, Randle stated that he had not previously suffered from the bunion (*Id.*). Randle appears to have subsequently sought further treatment for his bunion in June 2017, again requesting orthopedic shoes, and he was a no-show for at least one medical appointment relating to his bunion (Doc. 182-7 at 3). Randle complained about his bunion again in September and October 2017, with medical staff noting that he had been denied shoes (*Id.* at 4). He filed a grievance regarding his bunion in October 2017, with a response indicating that his grievance was forwarded to the health care unit and grievance office (Doc. 182-8 at4). In December 2017, a doctor appears to have indicated that wide gym shoes might help the bunion and scheduled a podiatry evaluation (Doc. 182-7 at 8). Randle also filed a grievance on December 18, 2017, complaining of lack of treatment for

his bunion (Doc. 182-8 at 2). A response to that grievance indicated that a copy had been sent to the health care unit, in addition to the original grievance which was forwarded to the grievance office (*Id.*). A grievance officer's report states that Randle was offered shoes in December 2017, but that he refused to try them on (Doc. 182-9 at 2). Randle appears to have still been suffering from his bunion in April 2018, however (Doc. 182-7 at 12–13). A grievance officer's report from that period indicates that Randle's request to purchase shoes had been denied and that he had elected to purchase the shoes himself (Doc. 182-10 at 2). Finally, in July 2018, Randle saw a podiatrist who prescribed wide, supportive shoes (Doc. 182-7 at 17).

Butler has stated in an affidavit that she was never aware of Randle's complaints regarding his bunion and deferred to medical staff for decisions regarding medical care (Doc. 173-2). Walls states that as administrator of the health care unit at Menard, she did not provide direct care to inmates, but she reviewed Randle's records upon receiving his grievance regarding the bunion and directed him to seek treatment at sick call (Doc. 173-3).

*Count Three:*

In March 2016, Randle was in Cell 521 in East House at Menard, and his cellmate was Darwin Dillard (Doc. 173-1 at 17–18). In a grievance filed on April 5, 2016, he stated that he notified correctional officer Lindsay about threats made against him by Dillard and that Lindsay passed his complaint on to Lieutenant Smolak (Doc. 182-2 at 2). Smolak then met with Randle together with Bump and Ward, Randle wrote (*Id.* at 3). In his deposition, Randle again stated that he had notified Lindsay and Smolak and that he had

additionally notified correctional officers Bump and Ward and written to Lane, then a psychologist at Menard, regarding Dillard's alleged threats (Doc. 173-1 at 17–18, 29–30). Randle stated that he never asked for protective custody from any of those individuals (*Id.*). Medical records indicate that Randle told a mental health practitioner, Jacob Weatherford, that he was concerned that his cellmate would harm him in February 2016 (Doc. 173-6 at 30). In his deposition, Randle characterized the threats made by Dillard as "snide remarks and things of that nature[,]" also describing them as "vague threats…as if he didn't want me in the cell with him" and saying that Dillard was "threatening to put his hands on me" (Doc. 173-1 at 20, 24, 29). On March 23, 2016, Randle alleges that an altercation occurred between Dillard and himself in which Dillard "went for [Randle's] mail and he tried to attack [Randle.]"(Doc. 173-1 at 24). Randle later stated that he wrestled Dillard to the floor, at which point he notified a correctional officer (*Id.*). After the incident, correctional officers took Randle to segregation, and Randle recalls that they did not give him medical treatment (*Id.* at 28). The next day, on March 24, Randle was taken for medical treatment, received psychological evaluation from Lane, and also saw correctional officers Bump and Ward as part of their internal affairs investigation of the altercation (*Id.*). Randle states that he was never again placed in a cell with Dillard, and that after the incident Lane, Bump, and Ward did everything in their power to protect him from Dillard (*Id.*). Randle further agreed that Butler did not fail to protect him from Dillard after the March 23 altercation (*Id.* at 29). Randle filed grievances on April 3 and 5, 2016, which he believed would reach Butler (*Id.* at 22). He forwarded a copy of one of those grievances to the Administrative Review Board (*Id.*). Butler has stated in an

affidavit that she was never aware of Randle's complaints regarding his cellmate (Doc. 173-2).

Bump states that he had never met Randle before March 24, 2016, and that Randle had never asked him for protective custody (Doc. 173-4). On that date, as a member of the internal affairs section at Menard, he and Ward met with Randle to investigate a sexual assault claim made by Randle against his Dillard (*Id.*).

*Count Four:*

Randle states that he was already receiving mental health treatment at the time that he arrived at Menard (Doc. 173-1 at 10). Medical records from January 2016 indicate that he was diagnosed with schizophrenia by mental health practitioners at Menard (Doc. 173-6 at 26). He sent grievance letters regarding his mental health treatment to the Administrative Review Board, which he believed would reach Baldwin (*Id.* at 32). He filed a grievance for Butler regarding mental health treatment on May 22, 2016 (*Id.*). Randle never heard back from either Butler or Baldwin, and he did not recall if his communications with Walls encompassed mental health treatment or were limited to his bunion. Randle did communicate with Lane regarding his mental health treatment, and she responded to his communication with letters on February 16, 2016 and July 7, 2016, noting that he was being seen by mental health providers (*Id.* at 33). Randle agrees that he was seen regularly by mental health providers during his time at Menard (*Id.* at 34). Randle was placed on crisis watch on two occasions in March and April 2016, and he believed that this crisis watch placement was punitive as he was not "homicidal or suicidal" but conceded in his deposition that doctors believed that he needed to be on

crisis watch at the time (*Id.* at 37). Randle's medical records indicate that after his altercation with his cellmate, he was placed on crisis watch from March 24 to March 28 because he was perceived to be upset about the altercation, though he repeatedly denied having homicidal or suicidal ideation (Doc. 173–5 at 20–32). Crisis watch notes from March 24 indicate that a mental health practitioner who saw him assessed that he was "anxious and overwhelmed" after the attack and that he was also grieving for his daughter, who had recently been in a car accident (Doc. 173-6 at 39). During this period, Randle received one-on-one therapy and was prescribed a number of medications for his mental health issues (Doc. 173-1 at 37–38).

Randle states that his second stint on crisis watch was due to a letter which he wrote to Lane, and Randle says that Lane "falsified" his statements in that letter as having stated that he would harm himself, Lane, or someone else, further alleging that Lane falsified his medical records (*Id.* at 40). Copies of the letters sent by Randle to Lane indicate that a letter from Randle was received on April 4, with another letter received April 18, the day that Randle was released from crisis watch (Doc. 182-5 at 2–7). In his letter of April 4, Randle wrote that "if someone is put in this cell with me, I will attack him right away without warning" (*Id.* at 4). Randle's letter of April 18 contains more generalized threats of violence, as well as direct threats against Lane, with Randle repeatedly writing that Lane "will suffer" (*Id.* at 6). Randle says that Dr. Trost confirmed to him that he was placed on crisis watch due to a desire to "embarrass or humiliate" Randle after his letter to Lane, further stating that prison officials wished to forcibly medicate Randle (Doc. 173-1 at 41). Randle states that Trost indicated he would be willing

to provide an affidavit, but no such affidavit has been provided, nor was Randle was ever forcibly medicated (*Id.*). Randle's medical records indicate that he was placed on crisis watch on April 11, 2016, after he expressed feelings of hopelessness and paranoia and refused medication, in addition to sending his first letter to Lane (Doc. 173-5 at 37). Notes indicate that Randle consistently insisted that he did not need to be on crisis watch, saying of his letter that he "didn't mean those things" and repeatedly describing the letter as "a cry for help" (*Id.* at 41, 52). Medical records confirm that Randle did speak to Dr. Trost on April 13, 2016, but do not indicate the content of that discussion (*Id.* at 43). Randle was again discharged from infirmary crisis watch on April 18, 2016 (*Id.* at 61–63).

Butler has stated in an affidavit that she was never aware of Randle's complaints regarding his mental health treatment and deferred to mental health staff for decisions regarding mental health care (Doc. 173-2). Walls states that she did not provide mental health treatment to inmates and was not involved in the administrative oversight of such treatment (Doc. 173-3).

## **LEGAL STANDARD**

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must

offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## ANALYSIS

### I. Count I: Cell Size

#### *A. Applicable Law*

For a prison official to be found liable for inhumane conditions of confinement, the official must be found to have known of and disregarded an excessive risk to inmate health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Vance v. Peters*, 97 F.3d 987, 992 (1996). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Knowledge cannot merely be inferred because an individual "should have perceived" that conditions were inhumane; rather, the Court must examine a prison official's subjective state of mind. *Id.* at 838. Where an official holds a supervisory role, they must be found to have been personally involved in the wrongful conduct such

that he or she caused or participated in the alleged constitutional violations. *Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002).

An official may be found to have been put on notice, however, by contemporaneous proceedings that allege similar constitutional violations. *Turley v. Rednour*, 729 F.3d 645, 653 (7th Cir. 2013). In *Turley v. Rednour*, 729 F.3d at 653, the Seventh Circuit specifically noted the long history of complaints regarding the size of cells at Menard, citing *Lightfoot v. Walker*, 486 F. Supp. 504, 511 (C.D. Ill. 1980), and *Munson v. Hulick*, 2010 U.S. Dist. LEXIS 67125 (S.D. Ill. July 7, 2010). Since the *Turley v. Rednour* decision, further proceedings have alleged that cells at Menard are unconstitutionally small. *E.g.*, Order and Injunction, *Turley v. Lashbrook*, No. 08-cv-07-SCW (S.D. Ill. Sept. 26, 2018); *see also Street v. Butler*, No. 14-cv-706 (S.D. Ill.); *Meskauskas v. Buskohl*, No. 15-cv-431 (S.D. Ill.).

*B. Discussion*

Butler and Baldwin seek summary judgment on Count One not by arguing that the size of Randle's cell was constitutional, but rather based on their contention that they lacked direct, personal involvement, and that Randle did not suffer harm as a result of his cell size. Neither of these arguments has merit.

Butler and Baldwin both held supervisory positions that gave them broad authority over Menard and over all of IDOC, respectively. While evidence has not been presented regarding the precise scope of their authority, the Court is sufficiently familiar with IDOC that it is comfortable making some general statements about their prerogatives—while Butler and Baldwin did not make individual decisions about where

inmates like Randle were celled, they did have significant input into policies regarding celling inmates at Menard. While neither Butler nor Baldwin likely had sole authority to determine whether or not individuals were double-celled or under what circumstances, it is incomprehensible that Butler and Baldwin could honestly contend that they were in no way personally involved in the chain of logistical and budgetary decisions that led to the double-celling policies that resulted in Randle's specific cell placement. Similarly, Butler and Baldwin cannot honestly claim that they were so far removed from individual cell placements that they were unaware that the decisions that they made resulted in double-celling and cramped placements such as Randle's. The long history of double-celling at Menard, the numerous lawsuits that have resulted from the practice and the periodic rebukes given to IDOC by this Court leave little room for doubt that the warden of Menard and the head of IDOC were aware of the individualized consequences of their broader logistical and budgetary decisionmaking and ultimately had direct personal involvement in double-celling inmates such as Randle.

Secondly, it is well established that individuals can be harmed by placement in cells that are unconstitutionally small, even if they have occasional opportunities to leave their cells and have not sought medical treatment from problems related to cell size. *E.g.*, *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Smith v. Fairman*, 690 F.2d 122 (7th Cir. 1982). The question is whether the totality of the conditions of confinement are sufficient to establish a constitutional violation. *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981). Here, Butler and Baldwin have presented insufficient facts for the Court to grant summary judgment on the issue of whether or not conditions were constitutional. Given this

Court's decision in *Turley v. Lashbrook*, No. 08-cv-07-SCW (S.D. Ill. Sept. 26, 2018), which dealt with similar cells in the same prison, there is a clear argument that conditions were not constitutional. Accordingly, summary judgment is denied on Count I.

## II. Count Two: Medical Treatment for Randle's Bunion.

### *A. Applicable Law*

In order to succeed in a claim for deliberate indifference based on inadequate medical treatment, a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant had a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

For a medical need to be deemed to present an objectively serious risk of harm, the need must be one that has been diagnosed by a physician, or one that is so obvious that even a lay person could recognize the necessity of medical attention. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). To establish that a defendant was deliberately indifferent, a plaintiff must show that officials were aware of the facts from which an inference could be drawn that a serious risk to inmate health exists, and they must also draw the relevant inference. *Farmer*, 511 U.S. at 837. This requires actual knowledge; it is not enough to show that prison officials should have been aware of the risk of harm. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Knowledge of the risk of harm is usually proven by showing that the inmate complained to prison officials about the conditions in question. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). A plaintiff need not show that an inmate's complaints and requests for assistance were literally ignored, but only

that the officials' responses "were so plainly inappropriate as to permit the inference that the defendant intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). An inmate need not present direct evidence of the official's state of mind, however, and circumstantial evidence can be used to infer an official's knowledge and intent. *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 196 (7th Cir. 2011) (citing *Farmer*, 511 U.S. at 842). Where prison officials are not medical professionals, they may rely upon the judgment of medical professionals as long as they do not actually ignore an inmate's mistreatment. *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008); *Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017).

Even if a defendant did disregard certain medical needs, this would only rise to the level of deliberate indifference and result in a constitutional violation if such disregard was "objectively, sufficiently serious" to constitute the "denial of minimal civilized measures of life's necessities." *Langston v. Peters*, 100 F.3d 1234, 1240 (7th Cir. 1996) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). In assessing this, the Court should look to factors including whether any harm actually resulted from the lack of medical attention. *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006).

*B. Discussion*

To start, there is little indication that Baldwin and Butler would ever have been aware of Randle's complaints regarding his bunion. Even to the extent that a jury might be able to find that Baldwin and Butler were aware, neither of those individuals is a medical professional, and thus they would have been justified in relying on the health

care unit to address any grievances regarding Randle's medical care. The Court finds that a reasonable jury could not find that Baldwin or Butler was aware of Randle's concerns regarding his bunion, and thus they could not be found to have shown deliberate indifference. Summary judgment is granted to Baldwin and Butler on this count.

Walls was aware of Randle's issues with treatment for his bunion, and she was a medical professional. The question, then, is whether she disregarded his serious medical needs. Walls does not appear to argue that Randle's bunion treatment is not a serious medical need. Rather, her contention is that she responded to his grievance in an adequate fashion. Randle appears to have filed grievances regarding his bunion on three occasions, in June 2016 and in October and December of 2017. Walls states that she received only the first grievance, and that she responded by noting that his medical records did not indicate that he had sought treatment, recommending that he go to sick call. Indeed, medical records do not indicate that Randle sought treatment prior to filing his first grievance, and Walls's response appears appropriate based on the documentation that she would have had, even if Randle did in fact seek treatment as early as 2012. As to Randle's subsequent grievances, the official responses state that copies have been sent to the health care unit. As such, a jury might reasonably find that Walls was aware of those grievances, and failed to respond. Even if that were the case, at that point Randle had already been seen by doctors regarding his bunion, and medical records indicate that he may already have refused new shoes on one occasion. He did finally obtain the orthopedic shoes that he sought not long after filing his 2017 grievances. Given his medical history, Walls's lack of response does not seem inappropriate, even if

she was aware of Randle's 2017 grievances, and the court does not envision how a reasonable jury could find her behavior to show deliberate indifference. Accordingly, summary judgment is granted for Walls.

## III. Count Three: Failure to Protect

### *A. Applicable Law*

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In order to state a section 1983 claim against prison officials for failure to protect, he must establish: (1) that he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the defendants acted with "deliberate indifference" to his health or safety. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010).

In claiming that a prison official was deliberately indifferent to such a risk, a plaintiff must show that the harm was objectively serious and that the official had actual knowledge of the risk. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). Actual knowledge can be shown through circumstantial evidence. *Id.*

### *B. Discussion*

Here, Randle was never placed in the same cell as Dillard after his altercation on March 23, 2016, and he acknowledges that Butler, Bump, and Ward took appropriate steps to protect him after that incident. Thus, Randle can only seek to show that Butler, Bump, and Ward failed to protect him before the incident occurred. All of these defendants state that they were unaware of any threats made by Dillard against Randle prior to the altercation between the two inmates. Randle claims that he spoke to Bump

and Ward prior to the altercation and informed them of threats made by Dillard, but there is no record of this. Even if a jury were inclined to believe this, Randle himself characterizes the threats as "vague threats" and "snide remarks," with nothing more specific than Dillard saying he would put his hands on Randle. Even if Randle did tell Bump and Ward of these threats, these kinds of statements don't seem calculated to put defendants on notice as to a substantial risk of serious harm, and the Court cannot envision a reasonable jury finding that Bump and Ward were deliberately indifferent in failing to take action. As for Butler, there is no indication that she had any awareness of threats against Randle before the altercation occurred.

Accordingly, the Court grants summary judgment to Bump, Ward, and Butler on this count.

## IV. Count Four: Mental Health Care

### *A. Applicable Law*

The standard for deliberate indifference claims based on failure to provide inadequate mental health treatment is the same as the standard for other types of health care, discussed above: a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant acted with a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Mental health issues have been found to be capable of rising to the level of an objectively serious risk of harm.

*B. Discussion*

Baldwin, Butler, Lane, and Walls seek summary judgment on this count. Baldwin and Butler argue that they were not aware of Randle's complaints about his care, and even if they had been aware they would have been justified in following the advice of medical professionals. Walls argues that she was not a mental health provider and had no authority over Randle's mental health care. Thus, she too would have been justified in relying on the actual mental health staff at Menard. Lane was a psychologist at Menard during the dates in question and was directly involved in Randle's mental health care. She received a number of grievances from Randle regarding his mental health care and recommended crisis watch for Randle's own health and safety. She argues that her response to his grievances was adequate and that she provided appropriate mental health care.

To start, the Court agrees that there is no indication that Baldwin or Butler was aware of Randle's grievances regarding his mental health care. To the extent that they might have been aware, they would have been justified in relying on the opinions of qualified mental health practitioners. Similarly, Walls was not responsible for mental health care and was justified in deferring to those that were responsible for that care. Summary judgment is granted to Baldwin, Butler, and Walls on this count.

As for Lane, while she was clearly aware of Randle's concerns regarding his treatment, she responded to those concerns, reviewing Randle's treatment and placing Randle on crisis watch. Indeed, Randle's claim seems not to be that Lane was indifferent to his treatment, but rather that he disagrees with the treatment that was prescribed by

Lane and other mental health practitioners who treated him, particularly his repeated placement on crisis watch. The Court finds nothing out of the ordinary in Randle's treatment, given the circumstances. Randle had been engaged in what he claims was a violent altercation with his cell mate and had been observed to be "anxious and overwhelmed." Particularly given his history of schizophrenia, crisis watch seems appropriate here. Subsequently, Randle sent a letter to Lane that contained threatening language which spoke of violence against others—Randle himself subsequently characterized this letter as a "cry for help." Again, crisis watch placement seems entirely appropriate here. Overall, the Court finds no merit in the claim that Lane was indifferent to Randle's condition. Rather, she was aware of his ongoing mental health treatment and took appropriate steps to further it. Summary judgment is granted to Lane on this count.

## V. Qualified Immunity

Defendants claim that they are entitled to qualified immunity on all counts. To determine whether an official is entitled to qualified immunity, the Court must assess (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Here, the Court has granted summary judgment on all counts except Count One, Randle's claim regarding the size of his cell. If, as Randle alleges, he was double-celled in a cell that was so small as to violate the minimum standards of decency, it would amount to a constitutional violation. This violation would be clearly established, for the Supreme Court and courts within this circuit have repeatedly addressed how excessively small

cells and overcrowding can violate the Eighth Amendment, even discussing this in relation to Menard specifically. Similarly, Butler and Baldwin are not entitled to qualified immunity based on their positions—while supervisory prison officials must be shown to have personal involvement in constitutional violations, it is clearly established that they too may be found liable. Accordingly, the Court denies qualified immunity on Count One.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment to all Defendants on Counts Two, Three, and Four and **DENIES** summary judgment to Defendants John Baldwin and Kimberly Butler on Count One. This action will proceed on Count One against Baldwin and Butler.

A telephone conference will be set at a later date (when the suspension of jury trials in the district due to COVID-19 has ended) to set firm dates for a final pretrial conference and jury trial.

**IT IS SO ORDERED.**

**DATED: April 1, 2020**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**